2023 IL App (2d) 220288
No. 2-22-0288
Opinion filed September 25, 2023

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 20-CF-2366 |
| WILLIAM J. TABER, | ) ) ) | Honorable Salvatore LoPiccolo Jr., |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE HUTCHINSON delivered the judgment of the court, with opinion.
Justices Birkett and Kennedy concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant, William J. Taber, appeals from the trial court's finding him not not guilty of

two counts of threatening a public official pursuant to section 12-9 of the Criminal Code of 2012

(Criminal Code) (720 ILCS 5/12-9 (West 2020)). Defendant contends that (1) the State failed to

prove him not not guilty of threatening a public official because probation officers are not public

officials as defined in section 12-9 of the Criminal Code, (2) his due process rights were violated

when the trial court ordered him handcuffed during the discharge hearing without first conducting

a hearing consistent with the requirements of Illinois Supreme Court Rule 430 (eff. July 1, 2010),

and (3) the trial court erred in admitting a document after the State failed to lay a proper foundation

for the business records exception to hearsay as required by Illinois Rule of Evidence 803(6) (eff. Mar. 24, 2022). For the reasons that follow, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3       On January 21, 2021, defendant was charged by indictment with two counts of threatening a public official, in violation of section 12-9 of the Criminal Code. The charges related to defendant allegedly sending threatening electronic messages to two probation officers (Julissa Gonzalez and Samantha Spooner) through a jail kiosk system.

¶ 4       On March 11, 2021, defendant filed a motion for determination as to whether probation officers are defined as public officials) in section 12-9(b)(1) of the Criminal Code (720 ILCS 5/12-9(b)(1) (West 2020)). On April 19, 2021, the trial court issued an order finding that probation officers are public officials as defined by section 12-9(b)(1) of the Criminal Code.

¶ 5       On July 7, 2021, the trial court found defendant unfit to stand trial and ordered him to be placed in a secure facility in the custody of the Department of Human Services on an in-patient basis. The trial court found that there was a substantial probability that defendant could be restored to fitness within one year, with appropriate treatment and education.

¶ 6       On May 3, 2022, the trial court again found defendant unfit to stand trial and further found that there was no substantial probability that he would become fit to stand trial by July 7, 2022. A discharge hearing began on July 8, 2022. Defendant filed a motion *in limine* arguing that some of the messages at issue sent through the jail kiosk system were not relevant because only five of them specifically referenced Gonzalez and Spooner. In denying defendant's motion, the trial court found that some of the messages "do not seem to have any connection whatsoever to Ms. Spooner and Ms. Gonzalez, but I do see connections with others ***. [Defense counsel] can object as you go along."

¶ 7    On the first day of the discharge hearing, defendant's counsel requested that defendant be unhandcuffed during the proceedings. The trial court denied the request, remarking, "due to the manning of the courtroom at this stage, I'm not going to disagree with the Sheriff's rules in regard to having two security [guards] in here before he can be unhandcuffed, so I'm not going to unhandcuff him at this time."

¶ 8    The State first called Gonzalez to testify. She testified that she was employed as the coordinator for mental health court with the Kane County probation office. Before becoming employed in her role, Gonzalez took an oath in front of a judge to support the constitution and the laws of the United States and the State of Illinois. The oath was a requirement for her to take on the duties required by the probation office and court services.

¶ 9    Gonzalez testified that she was defendant's primary probation officer in the Treatment Alternative Court (TAC) program from approximately November 2019 through December 2020. Gonzalez was given a county-issued phone for program participants to reach out when needed. Defendant was able to communicate with Gonzalez during this time through phone calls or text messages.

¶ 10    Defendant was terminated from the TAC program in early December 2020 for noncompliance with the program rules and expectations. Gonzalez was shown People's exhibit 1, a list of messages sent via a jail kiosk. Gonzalez read through the messages in People's exhibit 1 and testified, over defendant's objection, that some of the comments in those messages were consistent with communications she received from defendant through phone calls and texts when he was under her supervision with the TAC program. Gonzalez testified that she felt threatened by the jail kiosk messages. She felt unsafe both at work and home for fear of being sexually assaulted. Gonzalez confirmed her Elgin address and testified that she had resided there since 2018.

¶ 11    The State next called Spooner. She testified that she was employed with Kane County Court Services as a probation officer and was required to take an oath in front of a judge before beginning the job. Spooner was defendant's secondary probation officer during his time in the TAC program. Like Gonzalez, Spooner had a county-issued phone through which defendant communicated via phone calls or text messages. Defendant's phone number was saved in Spooner's phone, under his name. She recalled defendant sending 10 to 15 text messages per day, at all hours of the day. The messages stopped being sent to Spooner's phone after he was terminated from the TAC program in early December 2020.

¶ 12    Spooner was shown People's exhibit   and identified it as a list of jail kiosk messages she received on either December 10 or December 11, 2020. Over defendant's objection, she testified that she felt shocked, alarmed, and violated after reading the messages. Spooner had received previous messages from defendant that contained the same remarks and comments as those listed in the messages sent from the jail kiosk. Spooner confirmed that she had previously resided at an Aurora address.

¶ 13    The State next called Detective Peter Burgert with the Kane County Sheriff's Office to testify. Burgert was sent to investigate the messages sent through an inmate tablet and a kiosk request sent to probation officers through the Kane County Jail. During his investigation, Burgert and Detective Schwab spoke with defendant in an interview room in the Kane County Jail about the messages that were sent. When asked about the messages sent to Spooner, defendant responded that "he was testing things *** due to stress" and further stated "that he was mad and that they wouldn't give him commissary." When Burgert asked defendant what he meant by the messages, he said "I know who put me here. It was Sam, Julissa and Keith. They had to testify. I'm not stupid or do you think I'm stupid." Burgert recalled defendant admitting that he had looked up Spooner's

and Gonzalez's addresses on Google before sending the messages related to them. When Burgert asked defendant about the specific messages sent, he responded "that it was free speech and that it was essentially said out of anger." Burgert identified People's exhibit 1 as the messages that were sent and used as the basis for his questioning of defendant.

¶ 14 The discharge hearing resumed for its second day on July 11, 2022. Defendant's counsel again requested that defendant be uncuffed for the hearing. The following exchange then occurred:

"[DEFENSE COUNSEL]: At this time I would renew my request to have [defendant] uncuffed for the hearing.

THE COURT: Do we have two today?

DEPUTY: I can get someone. We can do one hand.

THE COURT: Okay. [Defense counsel], you can argue while we're waiting.

[DEFENSE COUNSEL]: Thank you Judge."

¶ 15 The State next called Dimitra Iliopoulos, a therapist at the Kane County Jail. She testified that the kiosk messaging system at the jail allowed inmates to put in requests "to seek medical, mental health classifications, sergeants, chaplain." A stationary kiosk was set up in the jail housing units, allowing inmates to use their assigned inmate identification number to log in  with a password to access the messenger system. The system places a date and time stamp on the messages. Inmates could use the kiosk or tablets to log in to the system. Tablets required the inmate to use photo recognition to verify identity. Iliopoulos testified that it could be determined that defendant sent the messages at issue, based on the information used to log in to the system.

¶ 16 When asked where the messages go after being sent by an inmate, Iliopoulos stated, "They go in the general messenger—I don't know, I guess like an app or system we use." As to how the messages are kept, she stated, "There is *** no individual in charge of this record keeping. It's the

same way how your email works[.]" She testified that the messages were "kept in the regular course of monitoring the messages for each individualized inmate."

¶ 17    The State sought to admit People's exhibit 1 under a business record exception to hearsay. Defendant objected, arguing that the State failed to meet the foundational requirements for an electronic communication's introduction as a business record exception to hearsay. The trial court admitted People's exhibit 1, finding as follows:

> "So, I'm going to admit this but not necessarily as a business record. I'm admitting it because the defendant has acknowledged through the testimony of Detective Burgert to making these statements, to sending these messages through the kiosk.
>
> So there we have authentication that he is the author of these messages and *** I'm going to admit it as what Julissa Gonzalez and *** Samantha Spooner received from the mental health department as to the messages that were sent or given to them from this defendant."

¶ 18    After both parties rested, the trial court stated that it would consider the following messages in making its ultimate ruling: (1) message sent December 10, 2020, at 10:15 a.m. reading, in part, "SAMANTHA IS A STRAIGHT UP HO[.] ILL DO JULISSA TO[.]"; (2) message sent December 10, 2020, at 5:54 p.m., "Upon release we'll visit samantha spooner at [Spooner's home address] then we'll proceed to visit julissa gonzalez at [Gonzalez's home address] *** these journeys are essential and we'll stop by to wish good fortune on the holidays."; (3) message sent December 11, 2020, at 8:33 a.m., "YOU GOT ME REALLY, REALLY, PISSED OFF. IM GOING TO DO WORK UPON RELEASE[.]"; (4) message sent December 11, 2020, at 8:37 a.m., "MY GRANDMA TOLD ME AND MY MOTHER, NEVER SAY WHAT YOUR GOING TO DO JUST DO IT. THAT'S GOOD ADVISE. I COMPLY WTH ONLY FAMILY[.]"; (5) message

sent December 11, 2020, at 8:47 a.m., "IM GONNA JUICE MY COCK ON SAM AND JULISSAS HOT SPIC A\*\*[.]"; and (6) message sent December 11, 2020, at 8:49 a.m., "DIRTY FILTY MEXICANS IM GLAD IM DONE WITH TAC, ILL BE BACK FOR A COCK SUCK GOD DAMN FILTHY WHORES."

¶ 19    On July 22, 2022, the trial court found defendant not not guilty on both counts of the indictment. Defendant was remanded to the Department of Human Services for further treatment, and the court extended defendant's treatment for 15 months from July 6, 2022.

¶ 20    On July 22, 2022, defendant filed a motion to reconsider, arguing that the trial court erred in not allowing him to be unhandcuffed during the proceedings and that section 12-9 of the Criminal Code does not include probation officers as public officials. On August 10, 2022, the trial court denied defendant's motion. This timely appeal followed.

¶ 21                                  II. ANALYSIS

¶ 22    In this appeal defendant contends that (1) the State failed to prove him not not guilty of threatening a public official because probation officers are not public officials as defined in section 12-9 of the Criminal Code, (2) his due process rights were violated when the trial court ordered him handcuffed during the discharge hearing without first conducting a hearing consistent with the requirements of Illinois Supreme Court Rule 430 (eff. July 1, 2010), and (3) the trial court erred in admitting a document after the State failed to lay a proper foundation for the business records exception to hearsay as required by Illinois Rule of Evidence 803(6) (eff. Mar. 24, 2022). We examine defendant's contentions in turn.

¶ 23    In his first contention, defendant argues that the trial court erred in its determination that probation officers are considered public officials under section 12-9 of the Criminal Code, because probation officers are not in the enumerated list of positions considered to be public officials, there

is no "office of probation," and probation officers are not appointed. Because neither Gonzalez nor Spooner were public officials, defendant argues, the State failed to prove him not not guilty beyond a reasonable doubt.

¶ 24    Defendant's first contention presents an issue of statutory construction and is subject to *de novo* review. *People v. Robinson*, 172 Ill. 2d 452, 457 (1996). The primary rule of statutory construction is to ascertain and give effect to the intent of the legislature. *People v. Hanna*, 207 Ill. 2d 486, 497 (2003). The best evidence of legislative intent is the language of the statute, which will be given its plain and ordinary meaning. *People v. Tucker*, 167 Ill. 2d 431, 435 (1995); *People v. Bole*, 155 Ill. 2d 188, 197 (1993). Statutes are read as a whole, so that interpretation of a statute's language does not render any part meaningless or superfluous and its words and phrases are construed in light of other relevant provisions of the statute. *People v. Ellis*, 199 Ill. 2d 28, 39 (2002); *In re Detention of Stanbridge*, 2012 IL 112337, ¶ 70.

¶ 25    Section 12-9 of the Criminal Code provides, in relevant part, as follows:

"(a) A person commits threatening a public official or human service provider when:

(1) that person knowingly delivers or conveys, directly or indirectly, to a public official or human service provider by any means a communication:

(i) containing a threat that would place the public official or human service provider or a member of his or her immediate family in reasonable apprehension of immediate or future bodily harm, sexual assault, confinement, or restraint[.]

* * *

(b) For purposes of this Section:

(1) 'Public official' means a person who is elected to office in accordance with a statute or who is appointed to an office which is established, and the qualifications and

duties of which are prescribed, by statute, to discharge a public duty for the State or any of its political subdivisions or in the case of an elective office any person who has filed the required documents for nomination or election to such office. 'Public official' includes a duly appointed assistant State's Attorney, assistant Attorney General, or Appellate Prosecutor; a sworn law enforcement or peace officer; a social worker, caseworker, attorney, or investigator employed by the Department of Healthcare and Family Services, the Department of Human Services, the Department of Children and Family Services, or the Guardianship and Advocacy Commission; or an assistant public guardian, attorney, social worker, case manager, or investigator employed by a duly appointed public guardian." 720 ILCS 5/12-9(a)(1)(i), (b)(1) (West 2020).

¶ 26    The Probation and Probation Officers Act (Act) (730 ILCS 110/0.01 *et seq.* (West 2020)) provides, in relevant part, as follows:

"§ 9b. For the purposes of this Act, the words and phrases described in this Section have the meanings designated in this Section, except when a particular context clearly requires a different meaning.

(1) 'Division' means the Division of Probation Services of the Supreme Court.

(2) 'Department' means a probation or court services department that provides probation or court services and such other related services assigned to it by the circuit court or by law.

(3) 'Probation Officer' means a person employed full time in a probation or court services department providing services to a court under this Act or the Juvenile Court Act of 1987. A probation officer includes detention staff, non-secure

group home staff and management personnel who meet minimum standards established by the Supreme Court and who are hired under the direction of the circuit court. These probation officers are judicial employees designated on a circuit wide or county basis and compensated by the appropriate county board or boards.

\* \* \*

§ 10. Before entering upon the duties of his or her office, each probation officer shall take and subscribe to an oath before the Chief Judge of his or her circuit or his or her designee to support the constitution and laws of the United States and of the State of Illinois, and faithfully to perform the duties of his or her office.

\* \* \*

§ 15. (1) The Supreme Court of Illinois may establish a Division of Probation Services whose purpose shall be the development, establishment, promulgation, and enforcement of uniform standards for probation services in this State, and to otherwise carry out the intent of this Act. The Division may:

 (a) establish qualifications for chief probation officers and other probation and court services personnel as to hiring, promotion, and training.

\* \* \*

(2)(a) The chief judge of each circuit shall provide full-time probation services for all counties within the circuit, in a manner consistent with the annual probation plan, the standards, policies, and regulations established by the Supreme Court. A probation district of two or more counties within a circuit may be created for the purposes of providing full-time probation services. Every county or group of counties within a circuit shall maintain a probation department which shall be under the authority of the Chief Judge of the circuit

or some other judge designated by the Chief Judge. The Chief Judge, through the Probation and Court Services Department shall submit annual plans to the Division for probation and related services.

(b) The Chief Judge of each circuit shall appoint the Chief Probation Officer and all other probation officers for his or her circuit from lists of qualified applicants supplied by the Supreme Court. Candidates for chief managing officer and other probation officer positions must apply with both the Chief Judge of the circuit and the Supreme Court.

\* \* \*

(12) For purposes of this Act only, probation officers shall be considered peace officers. In the exercise of their official duties, probation officers, sheriffs, and police officers may, anywhere within the State, arrest any probationer who is in violation of any of the conditions of his or her probation, conditional discharge, or supervision, and it shall be the duty of the officer making the arrest to take the probationer before the Court having jurisdiction over the probationer for further order." *Id*. §§ 9b(1)-(3), 10, 15(1)(a), (2)(a), (b), (12).

¶ 27    In this case, in order to determine if probation officers are public officials for purposes of section 12-9 of the Criminal Code, we must decide (1) whether probation officers are appointed to an office that is established by statute, (2) whether their qualifications and duties are prescribed by statute, and (3) whether they discharge a public duty for the state or any of its political subdivisions. See *People v. Carrie*, 358 Ill. App. 3d 805, 809 (2005). Based on the unambiguous language of the aforementioned statutory scheme (see *supra* ¶¶ 25-26), we find that probation officers are public officials for purposes of section 12-9.

¶ 28    The office of "probation officer" is established by the Act. 730 ILCS 110/0.01 *et seq.* (West 2020). The qualifications and duties of a probation officer are prescribed by the Division of Probation Services, established by the Supreme Court of Illinois in section 15(1) of the Act. *Id.* § 15(1). The Act requires each probation officer to undertake an oath to support the constitution and laws of the United States and the State of Illinois and to faithfully perform the duties of a probation officer. *Id.* § 10.

¶ 29    At defendant's discharge hearing, the State elicited testimony from Gonzalez and Spooner evidencing their positions as sworn probation officers at the time defendant sent the messages through the jail kiosk system. See *supra* ¶¶ 8, 11. Based on the foregoing, the trial court's determination that a probation officer is a public official was not error. Further, to prove defendant committed the act of threatening a public official pursuant to section 12-9 of the Criminal Code, the State must have proved that defendant knowingly delivered or conveyed a threatening communication directly or indirectly to a public official by any means. See 720 ILCS 5/12-9(a)(1) (West 2020). As defendant's claim of error rests solely on the assertion that probation officers do not qualify as public officials under section 12-9, the trial court's finding defendant not not guilty is affirmed based on the foregoing analysis.

¶ 30    We next examine defendant's contention that his due process rights were violated when the trial court ordered him to remain handcuffed during the discharge hearing without first conducting a hearing consistent with the requirements of Illinois Supreme Court Rule 430 (eff. July 1, 2010). Defendant argues that the trial court's decision to keep him handcuffed during the proceedings was error because it made no finding of a manifest need to do so.

¶ 31    A trial court should not physically restrain (or shackle) a defendant in court unless upon a showing of manifest need. *People v. Boose*, 66 Ill. 2d 261, 265-66 (1977). The court should state

on the record its reasons for shackling the defendant "and provide defense counsel with an opportunity to offer reasons" against shackling his or her client. *People v. Urdiales*, 225 Ill. 2d 354, 416 (2007). A trial court's failure to follow the procedure as established in *Boose* and subsequently codified in Illinois Supreme Court Rule 430 (eff. July 1, 2010) is a violation of the defendant's due process rights. *People v. Reese*, 2017 IL 120011, ¶ 49. Supreme court rules "are not suggestions [or aspirations]; rather, they have the force of law, and the presumption must be that they will be obeyed and enforced as written." *People v. Campbell*, 224 Ill. 2d 80, 87 (2006).

¶ 32    Rule 430 requires the trial court to conduct a separate hearing, outside the presence of the jury, to determine whether shackling the defendant is necessary. *Reese*, 2017 IL 120011, ¶ 48; Ill. S. Ct. R. 430 (eff. July 1, 2010). Following the hearing, the trial court must make specific findings on the 10 factors enumerated in Rule 430, weighing the defendant's right to due process against the manifest need for shackling him. Ill. S. Ct. R. 430 (eff. July 1, 2010). The manifest need must outweigh the defendant's right to be free from restraints. *Id.* Whether there is a need for handcuffing is a determination within the discretion of the trial court, and its finding will not be reversed absent an abuse of discretion. *Urdiales*, 225 Ill. 2d at 416.

¶ 33    The record shows that the trial court never conducted a formal hearing as required by *Boose* and codified under Rule 430. *Boose* and Rule 430 are derived from defendants' due process rights. *In re Benny M.*, 2017 IL 120133, ¶ 29. The error occurred here not because the need was not manifest but because the defendant was denied the required safeguards of his due process rights. See *People v. Allen*, 222 Ill. 2d 340, 349 (2006) (holding "the trial court's failure to follow the procedures set forth in *Boose* *** constitutes a due process violation"). The trial court did not provide defense counsel with an opportunity to argue against handcuffing defendant or offer an alternative. That alone is an abuse of the court's discretion, and thus, error occurred. *Id.*

¶ 34    The trial court's violation of Rule 430 was also a violation of due process. See *Reese*, 2017 IL 120011, ¶ 49. We must now examine whether the due-process violation was harmless beyond a reasonable doubt. See *id.* ¶ 50. Such an examination can involve the following approaches: (1) focus on the error to determine whether it may have contributed to the conviction, (2) examine the other evidence in the case to see if overwhelming evidence supports the conviction, and (3) consider whether the evidence is cumulative or duplicates properly admitted evidence. *People v. Shafer*, 2020 IL App (4th) 180343, ¶ 61. The third approach is inapplicable here, as this issue does not have to do with the introduction of inadmissible evidence.

¶ 35    Shackling of the accused should be avoided if possible because (1) it tends to prejudice the jury against the accused, (2) it restricts his or her ability to assist defense counsel during trial, and (3) it offends the dignity of the judicial process. *Boose*, 66 Ill. 2d at 265. The discharge hearing was conducted as a bench trial, so no jury prejudice against defendant was at issue.

¶ 36    Factors to be considered in assessing whether to restrain a defendant under Rule 430 include the "defendant's temperament and character known to the trial court either by observation or by the testimony of witnesses" and the "physical security of the courtroom, including the number of entrances and exits, the number of guards necessary to provide security, and the adequacy and availability of alternative security arrangements." Ill. S. Ct. R. 430 (eff. July 1, 2010). On the first day of the hearing, the trial court denied defendant's request to be uncuffed because only one security officer was available when two were required for defendant to be uncuffed. Additionally, the record shows that defendant had a history of angry outbursts during courtroom proceedings, of which the trial court was aware. During his fitness hearing, the trial court noted that defendant made several outbursts that disrupted his counsel's argument. The trial court admonished defendant regarding his outbursts. The trial court also noted that, throughout

earlier court proceedings, defendant had several angry outbursts directed at his counsel and at the court.

¶ 37 On the second day of the hearing, the trial court allowed defendant to have one hand uncuffed, allowing him to write notes to his attorney and participate in his own defense. In denying defendant's motion to reconsider, trial court noted that defendant spoke at length throughout all of the proceedings. Indeed, he was able to and did communicate with his attorney and the trial court. There is certainly nothing in the record to indicate that the manner in which defendant was handcuffed during the hearing offended the dignity of the judicial process.

¶ 38 While the trial court's failure to conduct a proper hearing pursuant to Rule 430 was a violation of defendant's due process, the error was harmless, as nothing in the record indicates that keeping defendant handcuffed contributed in any way to the trial court's finding him not not guilty. The evidence against defendant for threatening a public official was overwhelming, especially in light of the fact that defendant admitted to sending the threatening messages.

¶ 39 Defendant's final contention is that the trial court erred in admitting People's exhibit 1, because it contained hearsay and no proper foundation was laid to ensure the accuracy of the statements therein. The State maintains that it elicited sufficient testimony to lay a proper foundation.

¶ 40 The admissibility of evidence is a matter within the sound discretion of the trial court, and it will not be overturned on appeal absent a clear abuse of discretion. *People v. Nixon*, 2016 IL App (2d) 130514, ¶ 36. An abuse of discretion occurs only where the trial court's decision is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the view adopted by the trial court. *Id.*

¶ 41    A proper foundation is laid for the admission of documentary evidence when the document has been identified and authenticated. *People v. Ziemba*, 2018 IL App (2d) 170048, ¶ 51. Authentication of a document requires the proponent to present evidence that the document is what the proponent claims it to be. *Id.*; see Ill. R. Evid. 901(a) (eff. Jan. 1, 2011). The proponent needs to prove a rational basis upon which the fact finder can conclude that the document did in fact belong to or was authored by the party alleged. *Ziemba*, 2018 IL App (2d) 170048, ¶ 51. Documentary evidence, such as a text message, may be authenticated by either direct or circumstantial evidence. *Id.* ¶ 52. Circumstantial evidence of authenticity includes such factors as appearance, contents, substance, and distinctive characteristics, which are to be considered with the surrounding circumstances. *Id.*

¶ 42    Here, we find no abuse of discretion, as there was direct and circumstantial evidence that the People's exhibit 1, the messages sent by defendant from the jail kiosk system, was what the State claimed it to be. See Ill. R. Evid. 901(b)(1) (eff. Jan 1, 2011). A proper foundation for authentication of the messages was laid through Burgert, who interviewed defendant. During that interview, defendant admitted that he was the author of the messages. Defendant's admission to authoring the messages satisfies the authenticity requirement and offers reliability that the messages are what the State purported them to be. See Ill. R. Evid. 901(b)(4) (eff. Jan 1, 2011) (appearance, contents, substance, internal patterns, or other distinctive characteristics of an electronic communication, taken in conjunction with the circumstances, satisfies the requirements for authentication). Additionally, Iliopoulos testified that inmates must sign in with their ID number to send messages and that the messages are automatically time and date stamped and can be filtered using specific criteria. The testimony of Burgert and Iliopoulos authenticated People's exhibit 1. The trial court did not abuse its discretion where it admitted the electronic messages

generated from the jail kiosk system.

¶ 43                                III. CONCLUSION

¶ 44     We affirm the judgment of the circuit court of Kane County.

¶ 45     Affirmed.

---

***People v. Taber*, 2023 IL App (2d) 220288**

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Kane County, No. 20-CF-2366; the Hon. Salvatore LoPiccolo Jr., Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Thomas A. Lilien, and Drew A. Wallenstein, of State Appellate Defender's Office, of Elgin, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Jamie L. Mosser, State's Attorney, of St. Charles (Patrick Delfino, Edward R. Psenicka, and Jaylaan Slaughter, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

---